**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CAROLYN F. BRADLEY,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-391-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Carolyn Bradley brings this action pursuant to Section 405(g) of the Social Security

Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner

of Social Security denying her claim for disability insurance benefits under Title II of the Social

Security Act.  Her claim has a lengthy procedural history.

Bradley applied for disability benefits on June 18, 1993,[1] asserting that her disability began

---

[1]   The June 1993 application is the sole active application identified in the administrative decision, but the administrative record includes a copy of an earlier application that Bradley submitted in February 1992 that was apparently lost and never processed.  (Tr. 312).

January 18, 1987. (Tr. 128). Her insured status expired December 31, 1992. (Tr. 131). The Social Security Administration denied Bradley's application for benefits both initially and on reconsideration.

Bradley requested a hearing before an administrative law judge (the "ALJ"), and ALJ William Helsper held a hearing on April 24, 1995 in Fort Worth, Texas. (Tr. 68). Bradley was represented by counsel. ALJ Helsper issued an unfavorable decision in August 1995, but the Appeals Council vacated that decision and remanded the case to the ALJ for further consideration of Bradley's residual functional capacity and evaluation of her subjective complaints. (Tr. 272-73).

ALJ Helsper presided over a second administrative hearing on December 12, 1996, and in February 1997, issued another unfavorable decision. (Tr. 55). After the Appeals Council denied Bradley's request for review of the ALJ's decision, Bradley sought judicial review. The district court reversed and remanded the case to the administration for further consideration. *See Bradley v. Barnhart*, Civil Action No. 4:01-CV-369-Y (N.D. Tex. Dec. 20, 2001)(Order for Remand). Specifically, the Commissioner would assign the case to a new ALJ on remand; obtain a consultative evaluation consisting of testing for an organic brain disorder and a mental capacities assessment; and use a medical expert to determine the severity of Bradley's impairments and her functional capacity. (Tr. 439-40).

ALJ J. Frederick Gatzke conducted a third administrative hearing in January 2003, assisted by a medical expert and vocational expert. On February 27, 2003, the ALJ issued another unfavorable decision. (Tr. 378-89). The Appeals Council declined to assume jurisdiction of the case, and Bradley again sought judicial review. For a second time, the district court granted the

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 2

Commissioner's unopposed motion to reverse and remand the administrative decision for further administrative proceedings as indicated in the Commissioner's motion to remand. *See Bradley v. Barnhart*, Civil Action No. 4:01-CV-369-Y (N.D. Tex. June 15, 2004)(Order Granting Motion to Remand). In her motion, the Commissioner represented that, on remand, the ALJ would resolve the issue of Bradley's disability onset date and recontact examining neuropsychologist William Jones, Ph.D., for clarification of his opinion that Bradley was disabled. (Plf. App. at 19-20). The Appeals Council entered a concurring order on remand. (Tr. 624-25).

A fourth administrative hearing was held in Fort Worth, Texas on January 2005. (Tr. 730). Bradley was represented by counsel and testified during the proceedings, as did her husband. Medical expert John Simonds, M.D., also testified. On February 22, 2005, the ALJ issued a determination that Bradley was not disabled before December 31, 1992 because she was capable of performing a modified range of light work activity. (Tr. 611-20). This decision became the final decision of the Commissioner after the Appeals Council declined to assume jurisdiction of the case and no written exceptions were filed. 20 C.F.R. § 404.984.

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 3

use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527.  Second, the

claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §

404.1520(c). At the third step, disability will be found if claimant's impairment or combination of

impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* §

404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone,

the impairment or impairments must prevent the claimant from returning to his past relevant work.

*Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work,

considering the claimant's residual functional capacity, age, education, and past work experience.

*Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled.

If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the

process to show that there is other gainful employment the claimant is capable of performing in spite

of his existing impairments. *Crowley*, 197 F.3d at 198.  If the Commissioner meets this burden, the

claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276

F.3d 716, 718 (5th Cir. 2002).  A finding at any point in the five-step process that a claimant is

disabled or not disabled is conclusive and terminates the analysis.  *Masterson v. Barnhart*, 309 F.3d

267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner

applied the correct legal standards and whether the decision is supported by substantial evidence in

the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995);  *Hollis v. Bowen*, 837

F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 4

mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve.  *Masterson*, 309 F.3d at 272.  The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

C.     ISSUES

Whether the ALJ's determination is supported by substantial evidence and complies with relevant legal standards.

D.     ADMINISTRATIVE RECORD

1.     Medical History

Born November 22, 1940, Bradley was forty-six years old on January 18, 1987, her alleged onset date.  (Tr. 393). Bradley completed high school and has work experience as a customer complaint/ billing adjustments clerk in the telecommunications industry.  (Tr. 138, 454, 618).  Her medical problems began in 1974 when she became pregnant despite using a Dalkon Shield birth control device.  Several months into her pregnancy she was hospitalized for a uterine infection that resulted in a stillborn fetus and a total hysterectomy.  (Tr. 397-98).  The infection spread to her kidneys, liver, thyroid gland, and brain.  (Tr. 158, 305).  Since 1974, Bradley has been treated for

persistent headaches that have been attributed to encephalopathy[2] by at least one treating source. (Tr. 161). She reported making a variety of work-related adjustments to compensate for declining concentration and memory, but she continued to work until 1987. (Tr. 398-400).

In 1989, Bradley underwent court-ordered forensic testing associated with litigation she was pursuing against her former employer. (Tr. 249). Psychologist Kevin Karlson, Ph.D., administered a battery of tests, which revealed cognitive deficits, including memory, concentration and visual perception problems. Karlson opined that Bradley suffered from brain damage and intense chronic headaches as a result of a pelvic infection that spread to her brain and caused diffuse cortical and sub-cortical damage. Karlson noted that brain-damaged patients could minimize or even conceal the damage as long as they were not required to change their routine or learn new skills or information. (Tr. 250). He noted that old areas of learning were generally unaffected by the type of brain damage that Bradley sustained. (Tr. 250).

Bradley also underwent two comprehensive psychological examinations in 2002. The first was performed by Gerald H. Stephenson, Ph.D., on August 14, 2002. Bradley complained of daily intractable headaches and losses in cognitive functioning, including reading comprehension. (Tr. 452). She stated that she was fired after her employer accused her of being addicted to drugs. She sued her employer and settled her litigation in exchange for retirement benefits. Bradley's mental status examination was unremarkable, and she demonstrated an above-average level of intelligence. Her short-term memory was fair, and her immediate recall and remote memory were intact. She

---

[2] Encephalopathy refers to any degenerative disease of the brain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 590 (29th ed. 2000).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 6**

was able to perform serial threes and spell "world" backward, although she had mixed results when asked to perform mental arithmetic. (Tr. 455). Stephenson diagnosed a pain disorder that primarily involved physiological factors and involved mental states as a secondary factor. (Tr. 458).

Stephenson completed a medical assessment of Bradley's work-related mental abilities, and found few deficits in her ability to make occupational adjustments. Stephenson opined that Bradley would have less stress tolerance, and her attention and short-term memory could be affected by her prescription pain medications. (Tr. 459). He opined that Bradley had only fair ability to understand, remember and carry out complex instructions, but otherwise had good to very good ability to perform simple or detailed (but less than complex) job instructions. He noted that her age was also a vocational consideration. (Tr. 460).

Bradley underwent a neuropsychological evaluation with William Jones, Ph.D., over a two-day period in September 2002. (Tr. 569). Bradley complained of daily headaches and decreased attention and concentration. On examination, Bradley was distractible, easily confused, and overwhelmed when presented with fast-paced or ambiguous situations. Bradley's husband reported that his wife was unable to keep up with details and became emotionally labile.[3] Although her long-term memory was acceptable, her short-term memory and new memory encoding was poor. Bradley's husband opined that his wife had experienced even more deterioration in her memory in the last few years. (Tr. 570).

Jones administered tests that showed impairment in Bradley's ability to process auditory and

---

[3] In psychiatry, lability refers to emotional instability. *Id*. at 952.

visual information.  She exhibited impaired motor speed and general deficits in fine and gross motor coordination, emotional dysfunction, and severe impairment in abstraction, concept formation, judgment and reasoning.  (Tr. 577).  Jones diagnosed encephalopathy secondary to an infectious disease process in 1974 that caused brain cell death.  Additional diagnoses included a cognitive disorder and a major depressive disorder.  Jones opined that, as Bradley continued to age, she had become increasingly impaired and was now disabled and had been disabled for the past several years.  (Tr. 577).

Jones completed a medical assessment of Bradley's ability to performed work-related mental activities.  He opined that she had poor ability to make most occupational adjustments, although her ability to relate with coworkers or the general public was fair.  (Tr. 579).  He opined that she had poor ability to understand, remember and carry out even simple job instructions; perform within a schedule, maintain regular attendance, and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  Jones noted that Bradley demonstrated significant emotional lability when confronted with minimal levels of stress due to the her cognitive and other deficits.  (Tr. 580).

In January 2005, Jones supplemented his findings and clarified that Bradley's functioning had been at the level he described since at least December 31, 1992.  (Tr. 782, 785).  He indicated that he had reviewed his previous evaluation as well as the reports from Kevin Karlson and Gerald Stephenson before rendering his opinion.  (Tr. 785).  Jones also completed a psychiatric review technique form on which he indicated that Bradley's impairment met or equaled the severity of a

<u>**Findings, Conclusions and Recommendation of**</u>
<u>**the United States Magistrate Judge**</u>–Page 8

listed impairment.  He stated that his opinions on the psychiatric review technique form addressed Bradley's functioning since at least December 31, 1992.  (Tr. 770-82).

2.      Administrative Hearings[4]

a.      Medical Expert Evidence

Psychiatrist Ann Turbeville testified as a medical expert during the third administrative hearing.  She noted that two magnetic resonance imaging (MRI) studies in 1999 and 2002[5] showed lesions that were attributed to hypertension or vasculitis,[6] (Tr. 496, 523), while neuropsychological testing showed some memory and learning deficits; however, Turbeville considered the MRIs and test results to be too recent to provide an idea of Bradley's cognitive abilities before December 31, 1992. (Tr. 422). She noted that some people with chronic migraine headaches developed lesions in their brain that could cause dementia, but she was unable to say that this was true for Bradley in 1992. (Tr. 423).  The reasons Bradley stopped working were unclear to Turbeville because some reports noted a personality conflict between Bradley and her supervisor, some reports noted accusations of addiction to narcotic pain relievers, and some reports reflected that Bradley was unable to perform new job responsibilities.  Turbeville agreed that learning a new job, but not more minor work place changes, would be difficult for Bradley.  (Tr. 423-24).

Turbeville testified that it was difficult to identify what type of work Bradley could have performed during the relevant 1987-1992 time frame.  There was no information or medical

----

[4]  The ALJ relied on evidence presented at both the third and fourth administrative hearings.

[5]  The 2002 MRI was ordered after Bradley fell, striking her head.  (Tr. 495-96).

[6]  Vasculitis refers to inflammation of a blood or lymph vessel.  DORLAND'S at 1935.

evidence that Turbeville could use to measure the level of deterioration in Bradley's functioning. (Tr. 424-25).  Turbeville conceded that an MRI of Bradley's brain in 1970 could show the same positive findings as the later MRI studies, but was unable to say for certain, nor could she correlate any positive findings on the MRI scans with the type of symptoms that Bradley reported.  (Tr. 426). Turbeville testified that opiate pain medications could affect memory and the ability to organize, but also noted that Bradley had remained on stable doses of medication over the years and there was no indication that she was abusing her medication.  (Tr. 430).  When the ALJ asked Turbeville to address some of the tests administered by Karlson in 1989, Turbeville indicated that she was unfamiliar with those tests because she was not a psychologist.  (Tr. 428).

John Simonds, M.D., testified as a medical expert during the fourth administrative hearing. He summarized Bradley's medical history, including toxic shock syndrome in 1974 and persistent and chronic headaches.  (Tr. 733-34).  Simonds testified that Bradley's neurological examinations had been normal, and diagnostic tests were also within normal limits. He noted that Stephenson's mental capacity report was relatively unremarkable, while Jones had identified more problems with Bradley's functioning.  A recent MRI had also showed some non-specific disease process.

Simonds opined that Jones' report, when combined with the MRI findings, could meet or equal Listing 12.02[7] as of 2002.  (Tr. 735, 750).  Simonds observed that Jones had performed additional tests during his evaluation that Stephenson had not performed during the evaluation one month earlier; however, Simonds opined that it was too great a leap to conclude that Bradley's

---

[7] Listing 12.02 addresses organic mental disorders, which involve psychological or behavioral abnormalities associated with dysfunction of the brain.  20 C.F.R. Part 404, Subpart P, App. 1, Listing 12.02.

severe impairments in attention, concentration, judgment and memory were attributable to toxic encephalopathy in 1974. (Tr. 740). Simonds noted that the record did not contain test results from 1974 to confirm such a diagnosis. In addition, Simonds opined that the MRI findings were most likely a reflection of a hypertensive disorder, although he conceded that he was not an expert in that area of medicine. (Tr. 740). Simonds also noted that there was no way to determine how long Bradley's condition had been as severe as reflected in Jones' assessment because the disease was a progressive one that caused deterioration over time. (Tr. 741-42).

   b. Lay Testimony

  Bradley testified that she had trouble completing her work even before January 1987. She used her vacation time to cover days she missed work due to headaches, and also worked late or took work home with her to stay caught up with her assignments. (Tr. 755-56). She testified that her work pace had been slower because she had to proofread her assignments several times. She lost her position with the company after they assigned her new job duties that she was unable to do and accused her of drug addiction. (Tr. 395, 400-02, 757). Bradley testified that within days of her hysterectomy in 1974 she was aware that she had a problem because she had difficulty reading the messages scrolling across the bottom of the television screen in her hospital room. (Tr. 759-60).

  Bradley's husband of forty-six years also testified that his wife had received high performance ratings at work until the early 1980s when she failed training courses for her new job with AT&T. (Tr. 763-64). He testified that his wife began having work-related problems after recovering from the infection in 1974, and her condition continued to deteriorate even after she stopped working. (Tr. 412, 418-19). He testified that his wife was not reliable enough to maintain

competitive employment.  (Tr. 413).

     3.     ALJ Decision

     The ALJ found that Bradley had not engaged in substantial gainful activity since her alleged onset date, and met the disability insured status requirements through December 31, 1992.  He also found that Bradley had severe impairments during the relevant period that included a headache disorder with cognitive limitations secondary to a uterine infection; however, the ALJ did not find any impairments that met or equal the severity of a listed impairment.  The ALJ noted that Bradley had more recently been diagnosed with an organic brain impairment, but the ALJ found no objective evidence that Bradley had suffered from restrictions in her activities of daily living, social functioning, concentration, persistence or pace during the relevant time period, nor were there documented episodes of decompensation.[8] (Tr. 619).  Accordingly, the ALJ found no severe mental impairment existed before December 31, 1992.

     The ALJ considered Bradley's residual functional capacity and determined that Bradley had retained the exertional capacity for a modified range of light work activity with the following restrictions related to her headache disorder: Bradley was limited to simple, repetitive work not requiring the use of independent judgment and was capable of coping with only minimal changes

---

[8] There are four broad functional areas in which the ALJ rates the degree of functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth functional area (episodes of decompensation) is evaluated using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with gainful activity.  *Id.* § 404.1520a(c)(4). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, he generally may conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.  *Id.* § 404.1520a(d)(1).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 12**

in a daily work routine. (Tr. 619). Based on vocational evidence provided during a previous administrative hearing, the ALJ found Bradley was not capable of performing her previous work, but was able to perform a significant number of other jobs available in the national economy. The ALJ concluded that Bradley was not disabled or entitled to disability insurance benefits. (Tr. 620).

E.    DISCUSSION

Bradley contends that the ALJ did not properly evaluate her organic mental disorder, which Jones had opined met Listing 12.02. She further contends that the ALJ did not consider medical evidence that existed before December 1992 and supports Jones' conclusions that she was disabled on or before the date she was last insured for benefits. In his decision, the ALJ agreed that the results of Bradley's 2002 consultative evaluations demonstrated current disability, but he did not find that this disability existed before Bradley's insured status expired. (Tr. 614).

Social Security Ruling 83-20 prescribes the administrative policy and procedure for determining the onset date of a claimant's disability. *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993). *See generally* SOCIAL SECURITY RULING 83-20. The onset date is set as the date on which it is most reasonable to conclude from the evidence that a given impairment was sufficiently severe to prevent substantial gainful activity for a continues period of at least twelve months. SOCIAL SECURITY RULING 83-20. Onset date is important because it may affect the period for which a claimant can be paid, and it may determine whether a claimant is eligible for any benefits. *Id.*; *Spellman*, 1 F.3d at 361.

A claimant's alleged onset date is used as a starting point for determining the onset of non-traumatic disabilities, and the claimant's onset date is to be used as the established onset date when

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 13

consistent with the available evidence.  *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5ᵗʰ Cir. 1990).  The

claimant's onset date may be rejected only if reasons are articulated and those reasons are supported

by substantial evidence.  *Id.*  In addition, the Fifth Circuit and the Social Security Rulings require

the services of a medical advisor when there are issues regarding the onset of disability for

progressively debilitating disorders and the onset date is ambiguous.  *See Spellman v. Shalala*, 1

F.3d 357, 360-63 (5ᵗʰ Cir. 1993); SOCIAL SECURITY RULING 83-20.  The ALJ's selection of an onset

date must be supported by convincing rationale.  *See* SOCIAL SECURITY RULING 83-20.

Bradley complains that the ALJ gave undue weight to the testifying medical experts to

support his determination that Bradley was not disabled at any time before her insured status

expired.

She also complains of the ALJ's failure to comply with the district court's most recent remand order,

as well as the instructions of the Appeals Council on remand.

The district court remanded this case in June 2004 based on the Commissioner's

representation that the ALJ erred in rejecting Jones' opinion on grounds that Jones had not attempted

to retroactively establish an onset date.  The Commissioner stated that, on remand, the ALJ would

resolve the issue of an onset date and recontact Jones for clarification of his assessment.  (Plf. App.

19-20). The Appeals Council entered a corresponding order, finding that the record did not support

the ALJ's conclusion that Bradley had no severe mental impairment prior to her date last insured.

(Tr. 624).  The Appeals Council further found that Jones' disability opinions had been improperly

rejected without recontacting him for clarification or to solicit an opinion about the onset of

Bradley's disability.   (Tr. 624).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 14**

The Commissioner admits that the ALJ did not recontact Jones after remand.  Bradley took it upon herself to do so and elicited evidence from Jones that her functioning had been impaired to approximately the same extent since at least December 31, 1992.[9]  (Tr. 782, 785).  The ALJ acknowledged Jones' opinion that Bradley suffered from a disabling organic mental impairment before December 31, 1992, but the ALJ remarked on Jones' failure to otherwise establish a specific onset date.  The ALJ relied on medical expert Simonds, who stated that Jones' test results in 2002 did not relate back to Bradley's last insured date because the tests themselves did not specify when the mental limitations identified may have arose or accelerated.  (Tr. 617).

The ALJ found that Bradley's MRI and other diagnostic studies were not interpreted as showing or confirming an encephalopathy, but seems to place more importance on this lack of positive findings than is due.  Medical expert Simonds acknowledged, based on a review of the MRI studies as well as the 2002 neuropsychological test results, that Bradley may have had an organic brain impairment of listing-level severity by September 2002.   (Tr. 617).  In addition, the administrative regulations recognize that comprehensive neuropsychological examinations may be used to establish both the existence and the extent of compromise of brain function, particularly in

---

[9]   Specifically, Jones was asked

Can you reasonably infer, from your evaluation of the patient, the patient's history, your experience in treating patients with similar conditions, and (if applicable) reviewing the patient's prior medical records, that this indvidiual's functioning has been impaired to approximately the same extent you have indicated on this form at least since 12/31/1992?

(Tr. 782, 785).  Jones answered in the affirmative.

**Findings, Conclusions and Recommendation of the United States Magistrate Judge**–Page 15

cases of organic mental disorders.[10] 20 C.F.R. Part 404, Subpart P, App. 1, Listing 12.00(D)(8).

The ALJ relied on information from Bradley and her spouse that her condition had deteriorated more rapidly in the past few years, i.e., after her insured status expired. The ALJ does not explain how the information refutes medical source opinions that Bradley's condition was disabling before December 31, 1992, even if her condition has worsened with age. Conversely, the ALJ assigns no weight to the assertions of Bradley and her spouse that her memory and processing problems began following her recovery from an infection in 1974, which would indicate that her organic brain disorder was a technically severe–if not disabling–mental impairment before Bradley's insured status expired. A retrospective medical diagnosis uncorroborated by contemporaneous medical reports, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment. *Likes v. Callahan*, 112 F.3d 189, 190 (5th Cir. 1997).

The ALJ's determination that there was no indication that Bradley's mental limitations arose or accelerated before her insured status expired also conflicts with Karlson's court-ordered consultative evaluation in 1989. In his written decision, the ALJ acknowledges only that Karlson attributed Bradley's condition to an underlying headache disorder, but Karlson's actual determination was that Bradley suffered from brain damage and intense chronic headaches as a result of a severe pelvic infection in 1974. (Tr. 250). Karlson identified memory and concentration deficits, as well as visual perceptual problems. He also noted that brain-damaged patients had difficulty adapting to changes in routine or learning new information and skills, which he offered

---

[10] One test for brain dysfunction specifically approved in the regulations is the Halstead-Reitan, which Jones administered, but Stephenson apparently did not during his evaluation one month earlier. (Tr. 456, 575, 741). *See generally* 20 C.F.R. Part 404, Subpart P, App. 1, Listing 12.00(D)(8).

as an explanation for Bradley's reported difficulties at work.   (Tr. 250).   Karlson's opinions are similar to opinions that Jones offered after evaluating Bradley more than a decade later.

The ALJ also criticized Jones for opining that Bradley suffered from a disabling organic mental impairment before December 31, 1992 without otherwise specifying an established onset date. (Tr. 616).  If the ALJ found Jones' opinion was too imprecise with respect to Bradley's onset date, he should have taken the opportunity the court and the Appeals Council gave him to clarify Jones' opinion.  The administrative regulations likewise provide for recontacting medical sources when a report contains a conflict or ambiguity that must be resolved.  20 C.F.R. § 404.1512(e). The ALJ fails to provide a convincing rationale for selecting an onset date contrary to Jones' opinion that Bradley became disabled on or before the date her insured status expired.

The question becomes what to do with a case that has remained unresolved for thirteen years, has been the subject of four administrative hearings and four administrative decisions, and has been shuttled between the district court and the Commissioner on two prior occasions.  At least one of those occasions involved the same issue presented here, namely the determination of the onset date of Bradley's disabling mental impairments, yet the Commissioner did not make full use of the opportunity on remand to justify her decision that any disability postdated the expiration of Bradley's insured status.  (Tr. 383).

Although remand for further consideration may be a viable option, it is not the best option under the circumstances.  Bradley has made numerous attempts in the course of thirteen years to obtain a decision that is supported by the record and not a product of legal error.  The Commissioner presents no persuasive reason why Bradley's entitlement to a resolution of her case should be

delayed to give the Commissioner yet another opportunity to consider Bradley's application when the record already contains medical opinion evidence that Bradley's disability began on December 31, 1992, if not before.

<u>RECOMMENDATION</u>

It is recommended that the decision of the Commissioner be reversed and benefits awarded with a disability onset date of December 31, 1992. The case should be remanded to the Commissioner solely for the purposes of calculation and payment of disability benefits commencing December 31, 1992.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until March 20, 2006. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions

**<u>Findings, Conclusions and Recommendation of
the United States Magistrate Judge</u>–Page 18**

accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d

1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until March 20, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.   It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED FEBRUARY 27, 2006.


/s/ Charles Bleil
_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE